# EXHIBIT H

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BURTON W. WIAND, as Receiver for
VALHALLA INVESTMENT PARTNERS,
L.P.; VIKING FUND, LLC; VIKING IRA
FUND, LLC; VICTORY FUND, LTD.;
VICTORY IRA FUND, LTD.; and SCOOP
REAL ESTATE, L.P.,

      Plaintiff,

v.

BRIAN L. MEEKER, as Trustee for the     Case No.: 8:10-cv-166-T-17MAP
BRIAN L. MEEKER TRUST dtd 12/06/1991

      Defendant.

_____

BURTON W. WIAND, as Receiver for
VALHALLA INVESTMENT PARTNERS,
L.P.; VIKING FUND, LLC; VIKING IRA
FUND, LLC; VICTORY FUND, LTD.;
VICTORY IRA FUND, LTD.; SCOOP REAL
ESTATE, L.P.; and TRADERS
INVESTMENT CLUB,

      Plaintiff,

v.

SAMUEL ROSS MORGAN,     Case No.: 8:10-cv-205-T-17MAP

      Defendant.

_____

VERNON M. LEE, individually and as Trustee  Case No.: 8:10-cv-210-T-17MAP
of the VERNON M. LEE TRUST,

      Defendant.

_____/

## EXPERT WITNESS REPORT OF HAROLD McFARLAND, CPA, CMA, CFE,
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(2)

STATE OF FLORIDA
COUNTY OF SARASOTA

Before me, the undersigned authority, personally appeared HAROLD McFARLAND, who after being sworn to tell the truth stated that:

## A.   INTRODUCTION AND OVERVIEW

1.   I have been retained to express an opinion as to whether it can be shown that the Hedge Funds, Traders, and Fund Managers (Nadel–Moody) were insolvent beginning in 1999.   The Traders Investment Club is to be examined specifically to determine if it was involved in a Ponzi scheme from the beginning or at all.

2.   I am a Florida licensed Certified Public Accountant associated with the firm of Pellegrino Honick McFarland & Miller, P.A., located in Sarasota, Florida.   I have been a Certified Public Accountant in the State of Florida since 1992 and have been practicing for 20 years. Thomas Pellegrino, a partner in the firm with which I am associated,  and I  have examined the records provided by the Receiver and attorney John Hightower in reference to the hedge funds of Traders Investment Club, Valhalla, Victory, Viking, Scoop, Viking IRA, Victory IRA and Scoop Real Estate.

3.   I reviewed the Receiver's Reports prepared and published by Burton Wiand in his capacity as court-appointed Receiver for Valhalla Investment Partners, L.P.; the Viking Fund, LLC; Viking IRA Fund, LLC; Victory Fund Ltd.; Victory IRA Fund, Ltd.; and Scoop Real Estate, L.P.  A review of the Receiver's Reports shows that in Report #1 on Page 8 the Receiver states, "[his] investigation has uncovered evidence showing the fraud began at least as early as 2003 and in all likelihood before then." The Receiver's seventh interim Report states on page 10 that the "Commission's evidence showed that Nadel defrauded investors since at least January 2008."

4.   In our investigation at this point we have ignored claims that Mr. Nadel might have made to potential investors and examined the underlying statements for the particular funds in order to determine what actually occurred.   We compared our results with the Receiver's Report # 7 in Table 1 on Page 13. Our calculations do not agree with several of the years [conclusions] reported on by the Receiver. This would suggest an error or additional statements were used by the Receiver that were not provided to or otherwise made available to us.

5.     Some of these differences create major and disturbing inconsistencies. The loss in 2002 of $3,012,774 in the Receiver's Report is greatly different from our calculations that show a gain of $500,546, comprised of a loss of $622,748.56 in Valhalla 470P and a gain of $1,123,295.11 in Scoop Investments, LP 750A. Likewise, some of the Distribution totals do not agree with the information provided to us.  For example, we calculate the distributions of 2002 at $220,000 and the distributions in 2005 of $33,110,100.[1]  Part of the problem is tracing these distributions.  These make a substantial difference on the correct interpretation of the data.

6.     Given the Table 1 data supplied by the Receiver in his Seventh Report, even with the numbers that we feel are incorrect, the Receiver's data shows that the Hedge Funds' actual trading performance from the inception to 2005 was a positive of $22,897,878, net of trading losses incurred to that date.

7.     In addition, it appears that the Receiver assumed that all distributions made were from profits.  In fact, people who withdraw from [a hedge fund] receive a return of capital that is not part of a profit distribution. These different classifications of amounts distributed should be factored out when determining if distributions made were in excess of income.

8.     When all of the Funds in question are totaled for profitable years from 2002 through 2005, there were trading profits of $40,087,897.91.  When losses are included for the years that had losses, we calculated net investment trading profits of $38,357,746.96.  Based on the Receiver's Report #7, the Receiver acknowledges net profits of $28,147,422 for the same period, a number that we calculate as too low.  So, while our numbers may differ from the Receiver, we agree that during the years in question (2000-2005) Nadel Moody hedge funds earned a significant net profit on trades.

---

[1]     In late 2004, Nadel-Moody announced that it intended to create a hedge fund that would focus on real estate, rather than securities traded on exchanges.  Nadel Moody issued Private Placement Memoranda in conjunction with the announced start-up.  Nadel-Moody launched "Scoop Real Estate" in 2005.  Based on the number and amount of contributions made by investors in Scoop Real Estate it appears that the new Nadel-Moody hedge fund attracted serious investor interest.  While it can be ascertained that Nadel-Moody distributed more than $33MM from the stock funds, it is unclear how much of those distributions were redemptions involved a move of investor money from an older fund into the new real estate-based hedge fund.

9.  We conclude without fear of contradiction that based on the evidence we have received to date, Nadel-Moody appears to have operated a substantial underlying investment business between 1999 and 2005.

10. The recited facts in my opinion raise a significant doubt as to whether these hedge funds were in fact a Ponzi-scheme from the beginning or simply a legitimate business enterprise that at some point became a Ponzi scheme. While the Commission found it to be a Ponzi-scheme from 2008, there is insufficient information to determine when exactly, or if, it became a Ponzi-scheme before that."

11. With specific reference to the Traders Investment club account with Spear Leeds and Kellog account 782V the statements show that the earnings on Investments total 4,257,032.08 for the years 2003 – 2005. As such there was significant investment and trading going on as well as earnings recorded by a third party (Spear Leeds and Kellog) not a party to this action.

12. Traders Investment Club has detailed information on contributions, earnings and distributions for the years of its existence. This information includes detailed trade information as attached to the tax returns. This detailed information includes trade date, number of shares, stock name, and amount of the sale. However, any mention of this data is conspicuously missing from the declarations of the Receiver and his expert Ms. Yip. This information can be used to discover the account that was used to make these transactions. This account has not been identified or considered despite the fact that it shows 2.8 million dollars in trading profits from 1999 through 2005. Because these are specifically identified trades it would indicate that there is another brokerage account that is not being considered but to the best of my knowledge can be identified by tracing trades back to the account.

## B.  ANALYSIS OF THE DECLARATION OF MARIA M. YIP, CPA, CFE, CIRA

1.  I was retained to determine if Nadel-Moody was a Ponzi scheme since its inception. I chose to analyze the early years to determine if the evidence pointed to solvency or insolvency during the period beginning in 1999 and ending early in 2005. To make this determination, the early years have to be analyzed separate and apart from the later years. I have concluded that

it cannot be said to any reasonable certainty that any of the hedge funds were insolvent prior to 2006.  Prior to that time, there is either insufficient evidence to make a determination of insolvency with any level of confidence, or there is substantial evidence that they were not insolvent.

2. I have reviewed the Declaration of Maria M. Yip, CPA, CFE, CIRA, including the supporting document she provided as Exhibits 1–55.  Her Declaration indicates that she was retained to express an opinion as to whether there is evidence that the Hedge Funds, Traders and Fund Managers operated as a Ponzi scheme.

3. Ms. Yip states in her Declaration that "should additional documents and information be made available or reviewed, certain information of facts not currently in evidence may come to light, which may impact the observations and conclusions reflected herein,  I reserve the right to amend the Declaration based on information received after the issuance of same. "[2]  Per her statement, her conclusions are qualified and therefore uncertain.

4. The YIP Declaration focuses on analyzing either all years without directly examining the early years separate from the later years or focuses only on the later years.  She provides very little analysis of the early years.  She seems to have extrapolated backwards finding if Nadel-Moody was a Ponzi scheme in the latter years, then it must have been one in the earlier years.

   a. Paragraph 47 covers the entire period from May 1999–January 2009 and so does not address when Nadel-Moody became a Ponzi scheme or when any one fund became insolvent or when they all became insolvent.

   b. She states that "The money was raised as part of a single, continuous Ponzi scheme"[3] but she provides no evidence to support that finding other than analysis that includes the early years as well as the latter years.  An analysis that treats 1999-2009 as a single unit for characterizing the nature of the enterprise will produce misleading conclusions.  Analysis based on smaller time periods would more accurately reflect the differences between the early years and the later years. The evidence indicates that Nadel-Moody

---

[2] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 3, Paragraph 7
[3] Declaration of Maria M Yip, CPA, CFE, CIRA, Page 17, Paragraph 48

grew at an accelerating pace in the later years (post-2004). The accelerated growth can so heavily weight the totals in the later years that the data pointing toward insolvency overwhelms the data pointing to solvency prior to 2006. Ponzi-scheme results from the second half suggesting insolvency would overwhelm the data pointing to solvency from 1999 to January 2005.

c.  At Paragraphs 49–50, Ms. Yip makes comments that apply to the entire period from May 1999 through January 2009 without analysis of individual years.[4]

d.  Again at Paragraph 54, Ms. Yip states that they examined the brokerage statements listed in her Exhibit 4. With only two exceptions the periods examined were from 2002 and later with other information from 1999–2001 not examined.[5]

5.  Ms. Yip also states that "Money received from investors and deposited into the above accounts was pooled and commingled with other investors' money and transferred from those accounts into other bank, brokerage, and trading accounts"[6]. In my nineteen years as a CPA I have found this to be a common practice. Individual investors in mutual funds have an interest in the fund and once their money is deposited into the fund it is comingled with all other investors. The individual investor receives their share of the profits based on their ownership percentage of the mutual fund. Likewise, stock investments companies do not specifically identify individual stocks as owned by an particular investor. The investor invests money in the brokerage which then pools the monies and purchases large blocks of stocks which each investor owns a selected number of shares but they are not specifically identified. Hedge funds operate similarly. Even a bank pools a depositor's funds with funds from other depositors with the bank making investments from the pool. A normal reconciliation process would be required to show the amount of the funds belonging to each investor. Monies are entirely fungible; nobody can pick out a particular dollar and say it belongs to a particular person.

6.  Paragraph 59 is deceptive on its face. It compares the investor principal balances on the tax return with the value in the bank and brokerage

---

[4] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 17, Paragraphs 49, 50
[5] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 17, Paragraph 54
[6] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 19, Paragraph 57

accounts.[7] These are two totally different valuation methods which are not directly comparable. The tax returns report the investors' capital balance on a historical cost basis with trade income and loss reported as capital gains only when the investments are sold. The brokerage statements report investor capital balances on a current market value basis. For example, suppose a person invests $100,000 into a brokerage account and loses $25,000 in value due to a decline in the stock value. If the stock is not sold, it is reported on the tax return as $100,000, notwithstanding an imbedded loss in value. The same would be true for an investment that has seen unrealized gains. The original investment is the historical cost of the investment and is reported as such, changes in market value that are not realized notwithstanding. For tax purposes, an investment company does not claim profit or loss until the actual sale of the security. In this example, it would report the value on the tax return as $100,000, while the brokerage statement would show it at the current market value of $75,000.

The Tax Code provides the option to make a permanent election to use the "mark to market" method for the tax return and report the gains and losses as ordinary income instead of capital gains.[8] The only way the Yip analysis would make sense would be if this election was made. However, examining the tax returns for Traders Investment Club, Valhalla Investment Partners, Scoop Real Estate, LP, Scoop Investments, LP, Victory Fund, Ltd., Victory IRA Fund, Ltd., Viking Fund, LLC, and Viking IRA Fund, LLC, they show that this election was not made as all trade income is reported on Schedule D of the tax returns as capital gains. The instructions for Form 1065 Schedule D as published by the IRS state " ... a trader must report each sale of securities (taking into account commissions and any other costs of acquiring or disposing of the securities) on Schedule D or D-1 or on an attached statement containing all the same information for each sale in a similar format. However, if a trader made the mark-to-market election (see *Mark-to-market*

---

[7] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 20, Paragraph 59
[8] 26 USC §475, "Mark to Market Accounting Method for Dealers in Securities" at 26 USC §475(f)" Election to mark to market for traders in securities or commodities" states "In the case of a person who is engaged in a trade or business as a trader in securities and who **elects** to have this paragraph apply..." (*emphasis added*).

*accounting method* in the Instructions for Form 1065), each transaction is reported in Part II of Form 4797 instead of Schedule D or D-1"[9]

In addition, there are statements missing and multiple statements where Ms. Yip indicates that the source and use of funds is unknown.[10]   It appears that these are investment transactions including over $3.8 million in deposits that would significantly change this analysis if the entity to which the transfers were made is included in the Total in Combined Brokerage and Bank Accounts column of the table at Paragraph 59.

7.    The Yip Declaration also states that the Investor Statements showed a positive return "in almost all cases."[11]   The exceptions where there were losses were at the beginning of this period where it is in dispute as to whether a Ponzi scheme existed or the entities insolvent.   It is only the early years that include indications of losses.   The conclusion reached by Ms. Yip is valid only if the whole period is examined as one unit but not necessarily valid if the early periods were examined apart from the later periods.

8.    The Yip Declaration states that "Nadel utilized investor principal to pay new investors."[12]   She states they "used investor monies from the various Hedge Funds to pay for Traders' investors' redemptions."[13]   This appears to be the case near the end of the funds operation (2008-2009) but not at the beginning when amounts paid to investors from the bank account were significantly less than the principal investments.   This evidence points to the conclusion that Nadel-Moody was not a Ponzi scheme in the early years.

9.    Ms. Yip uses a specific example from 2003 where monies were transferred into the "Traders' Wachovia Account 8115" from Victory Fund ($200,000) and the money paid out only a few days later to an investor.[14]   Victory Fund appears to have given the money to Traders for investor redemptions.   What she does not say is that there were a lot of transfers

---

[9] 26 USC §475(d)(3)(A)(i) "In general Any gain or loss with respect to a security under subsection (a)(2) shall be treated as ordinary income or loss"
[10] Declaration of Maria M. Yip, CPA, CFE, CIRA, Exhibit 34
[11] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 21, Paragraph 63
[12] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 23, Paragraph 67
[13] Ibid
[14] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 23-24, Paragraph 72

into the Victory Wachovia bank account from "unknown" sources that parallel the contributions made by investors into Traders. It appears that these investor monies paid into Traders were deposited directly into the Victory bank account. Examination of the Victory bank account as provided by Yip shows that these monies were transferred out presumably to an investment account, but we do not know which one as Ms. Yip's analysis shows them all as transfers to "unknown."[15] We do know that Intex was doing some of the trading, but we have no detail on the Intex transactions. If Ms. Yip had them, she does not report it. Over $3.8 million was deposited into this account from "unknown" sources. It is only by assuming that none of this was from the investments activity in Traders that we can jump to the conclusion that the transfer in 2003 was not a return of capital and/or investment profits owed by Victory to Traders.

10.   Ms. Yip further states that between 2003 and 2006, at least $2.8 million was transferred from Victory to Traders.[16] This is not an issue if $3.8 million was provided before 2003 to Victory to invest for Traders. The Yip Declaration Exhibits show this is a possibility, as there are $3.8 million of unknown items that are summarily ignored in reaching her conclusion.[17]

11.   The Yip Declaration states that "as early as 2003 Traders did not have the assets necessary to pay the amounts represented as owed to investors."[18] The company started in 1999, so if it was not insolvent until 2003, then it was still not insolvent from the beginning.

12.   The Yip Declaration states that "Nadel lost more than $23 million over the period September 1999 and December 2008."[19] Once again, this provides only a single report stating the total for the whole period and does not do a year-by-year analysis. This can be entirely accurate in a situation where there was no Ponzi scheme initially but the entity became a Ponzi scheme later. This analysis is, as it stands, misleading.

13.   Ms. Yip provides an analysis in her Declaration that is inconsistent with the definition of solvency.[20] In it, Ms. Yip appears to confuse investor

---

[15] Declaration of Maria M. Yip, CPA, CFE, CIRA, Exhibit 34
[16] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 24, Paragraph 73
[17] Declaration of Maria M. Yip, CPA, CFE, CIRA, Exhibit 34
[18] Declaration of Maria M. Yip, Page 24, Paragraph 74
[19] Declaration of Maria M. Yip, Page 25, Paragraph 78
[20] Declaration of Maria M. Yip, Page 26, Paragraphs 80 - 83

contributions with liabilities. She starts by defining solvency as "an entity that has sufficient current assets to meet or exceed current liabilities." That is an appropriate definition. She quickly drops the word "current" in Item 81 to state that "to the extent that liabilities exceed the assets of the entity and its ability to meet these obligations, the entity is insolvent." This is not the same as current liabilities exceeding current assets, which is the appropriate definition. To further confuse the situation, she appears to assume that investor contributions are equivalent to liabilities. In fact, when an investor invests in a business, they assume the risk that they may not receive all, or any, of their investment back. If an investor puts $100,000 into an investment and the stock goes down $25,000, then the investor gets $75,000 back. There is no obligation to repay the investor the amount of their original investment. If that were the case, then the majority, if not all, of the brokerage firms would have been insolvent during the last downturn in the stock market as investments dropped and people were returned far less than they invested.

## C.   CONCLUSION

1.   Woefully insufficient evidence exists to support the claim that to a reasonable certainty the hedge funds operated in 1999 to 2004 were Ponzi schemes.

2.   There are far too many "unknown" entries in bank accounts and other financial documents as well as missing documents to make a determination possible. If these deposits and transfers are determined to be from investors, instead of just ignored as they were in Yip's Declaration, then it is reasonable to conclude that it was not a Ponzi scheme during the early years, and the transfers back to Traders [and similar] were returns of monies that were previously transferred to Victory [and similar entities] for the purpose of being invested. To reach the conclusion that "There is no evidence that any trading was conducted by Nadel on behalf of Traders in any account during the period July 1999 through June 2003" just because we do not have the records and the transfers were listed as "unknown" does not mean no trading occurred. [21] In fact, we have specific dates and transaction details that were filed with the tax returns and can

---

[21] Declaration of Maria M. Yip, CPA, CFE, CIRA, Page 23, Paragraph 71

be traced to specific trades to show that trading did occur. This tracing back to those transactions was not performed by Yip.

3.    The evidence supports a position that the entities were not a Ponzi scheme from the beginning but went through a fundamental change at some point.

4.    With specific reference to Traders Investment Club it appears that considerable information is missing, as well as at least one brokerage account, as related to over 2.8 million dollars of gains. Ms. Yip indicates that there was no significant activity that occurred in the Traders Investment Club but that is contradictory to the specific trade information available. This would indicate that her conclusion was reached without including all the relevant information and is therefore invalid on its face. It is my opinion that Traders Investment Club did not use new investor monies to pay past investors as distributions were from earnings and profits and a return of capital when the additional transactions and profits therefrom are included in the analysis.

FURTHER THE AFFIANT SAYETH NOT.

**HAROLD D. McFARLAND, CPA, CMA, CFE**

STATE OF FLORIDA
COUNTY OF SARASOTA

I HEREBY CERTIFY that on this day, before me, an officer fully authorized in the State and County aforesaid to take acknowledgments, personally appeared **HAROLD D. McFARLAND, CPA, CMA, CFE,** who is personally known to me, and he acknowledged before me that he executed the foregoing Declaration for the purposes therein expressed.

WITNESS my hand and official seal this _27th_ day of June, 2012.

NOTARY PUBLIC

NOTARY PUBLIC-STATE OF FLORIDA
Rebecca S. Leighton
Commission # DD848535
Expires:   OCT. 01, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

Page | 11