UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BURTON W. WIAND, as Receiver for
VALHALLA INVESTMENT PARTNERS,
L.P.; VIKING FUND, LLC; VIKING IRA
FUND, LLC; VICTORY FUND, LTD.;
VICTORY IRA FUND, LTD., AND
SCOOP REAL ESTATE, L.P.,

          Plaintiff,

v.                                  Case No. 8:10-CV-166-T-17MAP

BRIAN L. MEEKER, as Trustee for the
BRIAN L. MEEKER TRUST dtd 12/06/1991,

          Defendants.
_____/

## REPORT AND RECOMMENDATION

       This is one of many cases in this division emanating from a Securities Exchange Commission enforcement action aimed at dealing with the aftermath of a massive ponzi scheme perpetrated by Arthur Nadel, a hedge fund manager. *See S.E.C. v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-26TBM. After the SEC's action and the appointment of Burton Wiand as the Receiver, Nadel pled guilty in the Southern District of New York to a fifteen count indictment charging him with securities fraud, mail fraud, and wire fraud surrounding the events precipitating the enforcement action. The Receiver has sued numerous hedge fund investors, including Brian L. Meeker ("Meeker"), seeking to claw back "false profits" under two theories grounded on the same illegal scheme the indictment tracks: avoidance of fraudulent transfers under Florida's Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101,*et seq.* ("FUFTA"), and unjust enrichment.[1] Currently, the

_____

[1] These types of cases are often called "clawback" actions.

Receiver moves for summary judgment on a precise but critical issue to the determination of this action – Nadel operated the hedge funds as a ponzi scheme during the distributions of "false profits" to Meeker (*see* docs. 59, 90).   After considering Meeker's responses (docs. 89, 120) and the summary judgment record, I find that no material dispute of facts exists and recommend the Receiver's motion for summary judgment be granted.[2]   I also recommend Meeker's motion for summary judgment regarding the statute of limitations (doc. 93) be denied, and the Receiver's motion to strike expert McFarland (doc. 99) be denied.

   *A.  Standard of review*

   Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*  477 U.S. 317, 322 (1986).  A court, however, may only consider "that evidence which can be reduced to an admissible form." *Rowell v. BellSouth*

---

   [2]  The procedural posture of the Receiver's summary judgment motions warrants an explanation.  This Court convened early Rule 16 conferences in almost all of the more than 150 clawback cases and often grouped several cases at a time for such conferences in order to facilitate conversations and cooperation among counsel.  To a degree, that effort proved efficient as many cases settled and many defendants shared common resources.  Based on discussions with the parties at those conferences, the Court agreed to stagger the summary judgments.  Initially, the Receiver would file a motion for partial summary judgment on the liability issue, as the Receiver did here (*see* doc. 59).  That motion sought a finding as a matter of law that Nadel operated a Ponzi scheme from the inception.  Dependent on the ruling, the Receiver would file another summary judgment motion on damages (*i.e.,* the demand for false profits).  Given the number of cases pending, this bifurcated process, in hindsight, turned out to be too unwieldy.  With case-management deadlines pressing, the Receiver filed another motion for summary judgment (doc. 90).  Unlike the first, this one sought a summary judgment ruling on liability and damages.  The upshot of all this is that the two motions merge for decisional purposes, and the Court has considered Meeker's responses to the motions.  As with all the dispositive motions in this case and the other clawback cases, the district judge has referred them to me for reports and recommendations.

*Corp.*, 433 F.3d 794, 799 (11th Cir. 2005).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  In considering the evidence, the court resolves all reasonable doubts about the facts in favor of the non-moving party and draws all justifiable inferences in its favor.  *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  While the court does not weigh the evidence or make findings of fact, *see Anderson*, 477 U.S. at 249-50, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

   B.  *Background*

   This case is one of numerous clawback actions the Receiver has filed in this division.  With a few exceptions, all the complaints are alike in their recitals about Nadel, his conduct, and the Receiver's causes of action against a defendant.  Any differences are due to the peculiarities of the defendant and the dates and the amounts of the specific distributions made to a defendant.  Here, for example, the Receiver alleges Meeker received distributions from January 3, 2006 through September 11, 2007, totaling $645,641.67 in false profits.  *See* complaint (doc. 1, ex. A); Yip Decl. ¶ 3, September 27, 2012 (doc. 91).[3]  In a number of cases, including this one, the Receiver has

---

   [3]  Per the complaint, Meeker invested in Viking Fund.  Viking Fund is a Delaware Limited Liability Company formed in March 2001, and its managing member was Viking Management.  Viking Management retained Nadel and Scoop Management as the investment

moved for summary judgment on a discreet factual determination that goes to the heart of his FUFTA claims – that Nadel operated the hedge funds as a ponzi scheme from their inception. Frankly, the Receiver frames the factual issue more broadly than required.  Instead, the case-specific questions should be: Did Nadel operate the hedge funds as ponzi scheme when he made the distributions to Meeker, and if so, is the evidence so one-sided that the Receiver is entitled to summary judgment on this issue as a matter of law?  Before answering those questions, however, it is helpful to understand the events leading up to the Receiver's current partial summary judgment motion and FUFTA's application to a clawback case like this one.

### 1.  the events leading up to the current motion

Because these clawback cases presented overlapping legal arguments and a core of common, relevant facts, the Receiver initially filed an omnibus motion for partial summary judgment directed to a number cases, including Meeker (*see* doc. 27, ex. A).[4]  In that motion, the Receiver argued for the same factual determination he seeks in his current motion before the Court (*i.e.* Nadel operated the hedge funds as a ponzi scheme from the earliest hedge fund's inception (1999)).  But the prior motion differs significantly from the latter one as both sides have added to the summary judgment record and a new development occurred – Nadel's death. *See* Supplement to Receiver's Renewed Motion for Partial Summary Judgment, doc. 63.

### a.  the Receiver's first partial summary judgment attempt

In the first motion, the Receiver proffered certain items: Nadel's indictment, Nadel's plea

---

advisor, and as investment advisor, Nadel purported to direct and execute the vast majority of Viking Fund's investment and trading activities.  *See* complaint, ¶¶ 23-29.  *See also* Wiand Decl. (doc. 60).

[4]  The district judge referred these motions to me for reports and recommendations.

transcript and plea agreement letter, the government's sentencing memorandum, the criminal judgment, and some of Nadel's letters and personal memos. Armed with this record, the Receiver argued that the clawback defendants, including Meeker, should be "precluded from litigating facts necessarily established" by Nadel's guilty plea in the Souther District of New York (*see* doc. 27 at 10). Such a finding would have created the irrefutable presumption of an actual intent to defraud creditors beginning in 1999, the start date of the ponzi scheme. I interpreted the Receiver's argument to be a form of offensive collateral estoppel or some stand-alone doctrine of preclusion (*e.g.*, doc. 27, at 10 n.3). Many defendants, including Meeker, objected to this novel theory along two themes: offensive collateral estoppel did not apply to them and they needed to conduct additional discovery. After considering the Receiver's omnibus motion and the numerous responses made by the clawback defendants, I concluded offensive collateral estoppel did not apply. *See* doc. 52, Omnibus Order dated February 3, 2012.[5]  Nonetheless, I deferred any consideration of the motion's remaining aspects for a number of reasons so that the defendants could conduct further discovery and the Receiver could supplement the summary judgment record and address my evidentiary concerns about the then state of the record.[6]  *Id.*  Despite the fact that I deferred issuing

---

[5]   The Receiver continues to make his "preclusive effect" arguments even after my February 3 Order. I summarize the reasons why I rejected that argument in that Order here. Offensive collateral estoppel occurs when a plaintiff seeks to foreclose the defendant from litigating an issue the defendant previously litigated unsuccessfully in an action with another party. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326-27 (1979). Nadel was not a party to any of the clawback actions, and the defendants obviously were not defendants in Nadel's criminal action; accordingly, precluding the clawback defendants from being heard on the factual matters raised in their respective cases violated due process. *Id.* at 327 n.7. For these reasons and those outlined in the February 3 Order, the Receiver's arguments on this score are not well taken.

[6]   I also determined that Nadel's letters and memos were clearly inadmissible hearsay under Fed. R. Evid. 804(b)(3) because the Receiver had not shown Nadel to be unavailable as a

a report and recommendation on the Receiver's initial partial summary judgment, the February 3

Order has distinct, contextual relevance to the current summary judgment record.

### b.  the February 3 Order

Aside from putting off the consideration of the summary judgment issues until further

discovery could occur, the February 3 Order forewarned the parties, and particularly the clawback

defendants (including Meeker), about two interrelated points I considered important to the

determination of any future summary judgment motion.  The first reminded the clawback defendants

about their obligations when responding to a summary judgment motion:

> [I]f the moving the moving party makes the required showing, the burden shifts to
> the non-moving party to rebut that showing by producing counter-evidence in
> admissible form, *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); and the
> existence of some factual disputes between the litigants will not defeat an otherwise
> properly supported summary judgment motion unless the dispute presents a "*genuine*
> issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)
> (emphasis in original).[7]

The second point underscored the evidentiary significance of Nadel's criminal proceedings

for summary judgment purposes.  In short, while Nadel's judgment did not carry any preclusive

effect (as the Receiver argued), the clawback defendants could not ignore the summary-judgment

heft of the criminal proceedings and the significant evidentiary hurdle those proceedings posed to

them.  My admonitions about this were specific (doc. 52 at 7-9)[8]:

---

witness under Fed. R. Evid. 804(a).  Because a court evaluating a summary judgment motion
may only consider that evidence which can be reduced to an admissible form, these items were
unacceptable for summary judgment purposes. *See Rowell,* 433 F.3d at 800.

[7]  *See* doc. 52 at 4.

[8]  For the ease of the reader, the footnotes appearing in the February Order are not copied
in the body of the quoted text but as a newly numbered footnote which identifies the copied
footnote in the Order.

Nadel's plea transcript, however, is appropriate for summary judgment consideration either under Fed. R. Evid. 807 or as a declaration or deposition for purposes of Rule 56(c).  In short, the plea transcript carries a heightened standard of reliability and trustworthiness.  *See In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008) (applying Rule 807's residual hearsay exception due to proceeding's reliability); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (a defendant's admissions in a guilty plea proceeding and in a plea agreement that is part of the guilty plea carry "veracity safeguards" exceeding a deposition).  The same would be true for Nadel's sentencing hearing transcript, although Wiand does not include it with his motion.

Particularly significant is Fed. R. Evid. 803(22)(C)'s application, which Wiand does not address.  That rule, which applies irrespective of the declarant's availability, states that evidence of a final judgment of conviction based on a guilty plea is admissible if the evidence is admitted to prove "any fact essential to the judgment."  *See Scholes v. Lehmann,* 56 F.3d at 762 (applying rule  in clawback action at summary judgment stage).[9]  Of particular evidentiary significance, which none of the parties mention, is the judgment's order directing Nadel to pay $174,930,211.07 in restitution.   This figure, which corresponded to the loss calculation for guideline sentencing purposes, covers losses the fraud victims incurred from 1999 to 2009.[10]  So too is the amount Nadel forfeited to the

---

[9]  As the Order noted (doc. 52 at n.10):
Per Rule 802(22)'s advisory committee note, "[w]hen the status of a former judgment is under consideration in subsequent litigation, three possibilities must be noted: (1) the former judgment is conclusive under the doctrine of res judicata, either as a bar or a collateral estoppel; or (2) it is admissible in evidence for what it is worth; or (3) it may be of no effect at all … The rule does not deal with substantive effect of the judgment as a bar or collateral estoppel.  When, however, the doctrine of res judicata does not apply to make the judgment either a bar or a collateral estoppel, a choice is presented between the second and third alternatives.  The rule adopts the second for judgments of criminal conviction of felony grade."

[10]  As the Order noted (doc. 52 at n. 11):
From the government's sentencing memorandum (by its silence on the issue), it appears that Nadel did not contest the probation officer's loss calculations as set out in the presentence report. Fed. R. Crim. P. 32(c)-(f).  The presentence report and any addendum to it serve the same purpose as a pretrial stipulation in a civil bench trial, with the report setting out the factual and legal backdrop for the upcoming sentencing hearing and the addendum listing the disputed factual and legal issues that the court must decide.  *United States v. Wise,* 891 F.2d 970, 972 (11th Cir. 1989).  Nadel's failure to object acknowledged the accuracy of the

government ($162 million).[11]  Both amounts are dependent on facts essential to their calculations.

The statutory sentencing scheme enforces the adjudicatory effect to be given to the restitution order.  For example, 18 U.S.C. § 3664(*l*) provides:

> A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal or State civil proceeding, to the extent consistent with State law, brought by the victim.[12]

And per 18 U.S.C. § 3664(m)(1)(B), at the request of a victim named in the restitution order, the clerk is required to issue an abstract of judgment certifying the judgment in the victim's favor as noted therein and thereby allowing the victim to enforce the judgment as lien on property of the defendant.  The upshot of Rule 803(22) is that the Defendants are not looking at a blank summary judgment slate.

The Order's conclusion again reminded the defendants about their burden-shifting obligations

---

probation officer's loss calculation.  Of course the sentencing transcript would clearly speak to this issue as would the forensic accounting proof supporting the loss calculations.

[11]  As the Order noted (doc. 52 at n. 12):
Of particular note in criminal forfeitures like Nadel's is the relation-back doctrine, which operates retroactively to vest title in the government effective as of the time of the act giving rise to the forfeiture.  *United States v. Bailey*, 419 F.3d 1208, 1213 (11th Cir. 2005).  *See also United States v. 92 Buena Vista Ave.,* 507 U.S. 111, 125 (1993).  Wiand does not include the forfeiture order issued by the court in the Southern District of New York.

[12]  As the Order noted (doc. 52 at n. 13):
Although I find no cases interpreting the scope of 18 U.S.C. § 3664(*l*), the provision simply implements issue preclusion or collateral estoppel principles.  By its strict wording, it plainly would not apply to these clawback actions as they are not technically suits initiated by a "victim," despite Wiand's equitable, fiduciary obligations to the victims.  However, the practical effect of Nadel's conviction is that he will not be able to deny essential facts that judgment necessarily incorporates.  *Scholes v. Lehmann*, 56 F.3d at 762 (when considering summary judgment motion, a witness should not be permitted by a subsequent affidavit to retract admissions made in plea agreement).

under the summary judgment scheme: "Nadel's criminal conviction, and the facts it necessarily embraces, not to mention the accessible proof available from that prosecution, are convincing evidentiary hurdles Wiand puts out for the Defendants to meet." *See* doc. 52 at 9-10.

### c. new evidentiary material and Nadel's death

The Receiver's summary judgment papers move for the same factual finding as the original motion for partial summary judgment but add new evidentiary material including: the criminal judgment against Nadel on counts one through and fifteen in the indictment, the restitution order included within that judgment in the amount of $174,930,311.07, the sentencing transcript, the forfeiture order, and the declaration of forensic accountant Maria Yip. *See* docs. 73-17; 73-18; 73-19; 61 (Yip Decl., March 23, 2012); 67 (Yip Supp Decl., May 11, 2012); 82-1 (Revision to Yip Decl., July 19, 2012); 91 (Yip Decl., Sept. 27, 2012); 101 (Yip Decl., Oct. 11, 2012). Moreover, in light of Nadel's death on April 16, 2012, the previous complaints about Nadel's personal letters and memos dissipated. The Receiver now satisfied the unavailability demands of Fed. R. Evid. 804(a), and Nadel's statements against interest are appropriate evidentiary considerations for summary judgment purposes.

### 2. FUFTA

A vast majority of states have adopted the Uniform Fraudulent Transfer Act (UFTA), an act "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." *BMG Music v. Martinez,* 74 F.3d 87, 89 (5th Cir. 1996). Federal district and bankruptcy courts adopt a largely uniform practice allowing receivers to bring suits under UFTA against ponzi scheme investors to the extent that investors have received payments in excess of the amounts invested and those payments are avoidable as fraudulent transfers. *Donell v. Kowell,* 533 F.3d 762, 770 (9th Cir.

2008) ("the policy justification is ratable distribution of remaining assets among all defrauded investors").   Hence, the innocent "winners" in a ponzi scheme should not be permitted to "enjoy an advantage over later investors sucked into the ponzi scheme who were not so lucky."   *Id.* citing *In re United Energy Corp.,* 944 F.2d 589, 596 (9th Cir. 1991).

Under Florida's version ("FUFTA") (*see* Fla. Stat. § 726.101, *et seq.*), like other UFTA schemes, a receiver may proceed under two theories, actual fraud or constructive fraud.   *See e.g. Wiand v. Waxenberg,* 611 F.Supp. 2d 1299, 1318-19 (M.D. Fla. 2009); *In re World Vision Entertainment, Inc.*, 275 B.R. 641 (M.D. Fla. 2002).   And in count I, the Receiver proceeds under both of these theories.   Under Fla. Stat. §726.105(1)(a), codifying actual fraud, the Receiver claims the transfers of false profits were fraudulent because Nadel (the debtor) caused the hedge funds to make the transfers to Meeker as part of a scheme with actual intent to hinder, delay, or defraud creditors of Nadel, the fund managers and/or the hedge funds.[13]   As such, the Receiver alleges a right to repayment of the investors' commingled principal investment money in an amount equivalent to Meeker's false profits from one or more of the hedge funds.   The Receiver also proceeds under Fla. Stat. §§ 726.105(1)(b) and 726.106(1), for constructive fraud.[14]   *See* doc. 1, ¶¶

---

[13]   The Receiver alleges that in light of the right to repayment, the hedge funds have a claim against Nadel and consequently are creditors of Nadel under FUFTA; thus, Nadel is a debtor under FUFTA.   For this case, the Receiver contends that the transfers of false profits to Meeker were inherently fraudulent because they were made as part of Nadel's scheme.   As representative of the receivership entities (the hedge funds), the Receiver asserts he is entitled to avoid and recover transfers equal to the amount of false profits that Nadel caused the hedge funds to make to Meeker, and any other pertinent remedy available under Fla. Stat. §726.108, because the money was commingled among hedge funds and Nadel used the hedge funds as a single, continuous scheme.   *See* doc. 1, ¶¶ 105-112.

[14]   A transfer is fraudulent under a theory of constructive fraud if the transferor does not receive reasonable value in exchange and the transferor either (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the transferor were

109-112.

Where a debtor engages in a ponzi scheme, proof of a ponzi scheme satisfies UFTA's "actual intent to hinder, delay, or defraud creditors" requirement. *See Donell, supra,* 533 F.3d at 770-71 citing *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995) (general rule is that to extent innocent investors received payments in excess of amounts of principal originally invested, payments are avoidable as fraudulent transfers); *Wiand v. Waxenberg,* 611 F.Supp.2d 1299, 1312 (M.D. Fla. 2009) citing *In re McCarn's Allstate Fin. Inc.,* 326 B.R. 843, 850 (M.D. Fla. 2005) (existence of a ponzi scheme suffices as a matter of law to prove actual intent to defraud for purposes of Fla. Stat. §725.105(1)(a)).   To prove a ponzi scheme, the Receiver must establish: (1) deposits made by investors; (2) the Receivership Entities conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Receivership Entities produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors. *Waxenberg, supra,* at 1312. Here, the Receiver's motion for summary judgment adopts this ponzi-scheme method to establish that the monies transferred to Meeker were fraudulent transfers in violation of §726.105(1)(a).

---

unreasonably small in relation to the business or transaction; (2) intended to, believed, or reasonably should have believed that he or she would incur debts beyond his or her ability to pay them as they became due; or (3) was insolvent at the time of the transfer. *See* Fla. Stat. §§ 726.105(1)(b)(1)-(2) and 726.106(1). The Receiver asserts that the transfers were also fraudulent under Fla. Stat. § 726.105(1)(b) because Nadel caused the hedge funds to make those transfers and Nadel, the fund managers, and the hedge funds were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction, or Nadel intended that he, the fund managers, and/or the hedge funds incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due. Finally, the Receiver asserts that the transfers were fraudulent under Fla. Stat. § 726.106(1) because neither Nadel, the fund managers, nor the hedge funds received a reasonably equivalent value in exchange for those transfers to Meeker, and Nadel, the fund managers, and the hedge funds were insolvent at all relevant times. *See* doc. 1, ¶¶ 110-111.

11

Although the Receiver points to the start date of Nadel's scheme as the critical date, the relevant period is the time of the transfers. *In re Old Naples Sec., Inc.,* 343 B.R. 310, 319 (M.D. Fla. 2006) (examining intent at time transfers made when interpreting Fla. Stat. §726.105(1)(a)); *Veigle v. U.S.,* 873 F.Supp. 623 (M.D. Fla. 1994) (determining transferor's intent to defraud at time transfer made for purposes of Fla. Stat. 726.105(1)(a)); *Bay View Estates Corp. v. Southerland,* 154 So. 894 (Fla. 1934) (fraud rests upon debtor's intent at time of the transfer).   Hence, whether Nadel operated the hedge funds as ponzi scheme as early as 1999, as the Receiver proposes, is an unnecessarily broad question to examine.   *See* doc. 1, ex. A.  For Meeker, the relevant time is from January 3, 2006 through September 11, 2007, the beginning and ending dates of its distributions. Accordingly, if the Receiver's ponzi-scheme evidence for this period is one-sided (i.e., the evidence of actual intent to hinder, delay, or defraud creditors is so one-sided), the Receiver is entitled to summary judgment on the issue.  *Anderson,* 477 U.S. at 255 (when confronted with a summary judgment motion a court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"); *Hickson Corp. v. Northern Crossarm Co., Inc.,* 357 F.3d 1256, 1260 (11th Cir. 2004) (same).

### C.  Discussion

With the above principles in mind, the summary judgment record overwhelmingly points to the fact that Nadel operated the hedge funds as a ponzi scheme by the time Meeker received its first distribution in January 2006.  In sum, the Receiver's forensic accountant confirms what Nadel admitted in his criminal proceedings and that court adjudicated.  Even when the summary judgment record is viewed in Meeker's favor, Meeker offers little to overcome the Receiver's properly supported motion.

12

### 1.  an overview of the scheme

From 1999 through January 2009, Nadel, through Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management"), along with Christopher Moody and Neil Moody, through Valhalla Management, Inc. ("Valhalla Management") and Viking Management, LLC ("Viking Management") (Scoop Capital, Scoop Management, Valhalla Management, Viking Management are collectively the "fund managers") managed certain hedge funds including Valhalla Investment Partners, L.P. ("Valhalla Investment"), Viking Fund, LLC ("Viking Fund"), Victory IRA Fund, LLC ("Viking IRA Fund"), Victory Fund, Ltd. ("Victory Fund"), Victory IRA Fund, LTD ("Victory IRA Fund"), and Scoop Real Estate, LP ("Scoop Real Estate").   And throughout this period, Nadel misrepresented the hedge funds' performance.  By defrauding investors through his control over the fund managers and the hedge funds, Nadel raised over $350 million dollars from hundreds of investors.  While a large majority of hedge fund investors received no distributions of purported profits, or received distributions in amounts less than their investments, a number of investors received hedge fund distributions that exceeded their investments.

In late 2008 or early 2009, the house of cards crashed.  The SEC filed an emergency action in this division on January 21, 2009, asking for a wide-ranging temporary injunction freezing Nadel's assets, requiring him to provide a sworn accounting, and prohibiting his travel outside the United States.  The district judge quickly granted the request.  *See Securities and Exchange Commission v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-26TBM.  Coinciding with these events, a magistrate judge in the Southern District of New York issued a warrant for Nadel's arrest based on a complaint charging Nadel with securities fraud and wire fraud.  At some point during all this

(and likely before the enforcement order), Nadel fled.[15]   Eventually, the complaint in the Southern

District ripened into a fifteen-count indictment that charged Nadel with securities fraud (counts one

through six), mail fraud (count seven), and wire fraud (count eight through fifteen).   Nadel pleaded

guilty to all the counts, was sentenced to 168 months in confinement, and ordered to pay

$174,930,311.07 in restitution (doc. 60).   He died in prison on April 16, 2012.

　　　　*2. Yip's analysis*

The Receiver submits the analysis of his forensic accountant, Maria M. Yip ("Yip"), to

support his contention that Nadel operated the hedge funds as a ponzi scheme.   Yip analyzed records

from 29 bank accounts, 24 brokerage and trading accounts, the hedge funds and fund managers'

books and records, accounting records of the receivership entities, Advent Software investor

accounting system activity, member status reports, tax records for Traders Investment Club and the

receivership entities, and reports prepared by Riverside Financial Group analyzing account activity

for brokerage accounts ("the Nadel documents").[16]   Yip opines that from at least December 1999

through January 2009, Nadel through the fund managers managed the hedge funds and grossly

misrepresented their performance, and defrauded investors through his control of the hedge funds

---

[15]   All this is in the public record.   Nadel was arrested and appeared in this division for removal proceedings on the Southern District's warrant.   *See United States v. Arthur G. Nadel*, Case No. 8:09-MJ-1039-MAP (doc. 5).

[16]   Affidavits such as Yip's have routinely been admitted to demonstrate that an enterprise operated as a ponzi scheme and was consequently insolvent.   *Stenger v. World Harvest Church, Inc.*, 2006 WL 870310, *11 (N.D. Ga. 2006) citing *In re Lake Country Invs.*, 255 B.R. 588, 595-96 (Bankr. N.D. Idaho 2000) (expert affidavit sufficient); *In re Ramirez Rodriguez*, 209 at 431 (expert affidavit sufficient); *In re Colonial Realty Co.*, 209 B.R. 819, 821-22 (Bankr. D. Conn. 1997) (expert affidavit sufficient); *In re Taubman*, 160 B.R. 964, 976-80 (Bankr. S.D. Ohio 1993) (expert affidavit sufficient); *In re Int'l Loan Network, Inc.*, 160 B.R. 1, 7-10 (Bankr. D.D.C. 1993) (expert affidavit and prior judicial decisions sufficient).

(Yip Decl. ¶ 25, March 23, 2012).[17]  Yip further opines:

> Based on our review and analysis of the documents, Nadel in combination with Christopher Moody and Neil Moody raised at least $327 million from investors between May 1999 and January 2009.  The money was raised in connection with more than 700 investor accounts.  The money was raised as part of a single, continuous Ponzi scheme.  Investors received statements ("Investor Statements") on a monthly basis for each of their respective accounts.  These Investor Statements showed purported appreciation and increase in Investor Account balances that were in fact not true.  Providing these fictitious balances not only maintained the investors "in the dark" about the actual performance of these funds but just as important, it served as the basis for the Management Fees that the Fund Managers charged to each of the Investor Accounts.

Yip Decl. ¶¶ 47-50, March 23, 2012; Revision to Yip Decl. ¶8 (revising amount raised from $336 million to $327 million based on further review and analysis), July 19, 2012. Yip's review of the financial records and comparison of balance of principal invested by investors according to the K-1s issued by the hedge funds with the actual balance in the bank, brokerage and trading accounts during the years 1999 through 2008 revealed that Nadel significantly misrepresented the values in the investor accounts and the investor accounts had a fraction of the purported balances (Yip Decl. ¶59, March 23, 2012; Revision to Yip Decl. ¶9, July 19, 2012).  She finds, based on a comprehensive review of the books and records of the hedge funds, that the funds were insolvent as early as 2000 and through and including January 2009 (Yip Decl. ¶82, March 23, 2012; Revision to Yip Decl. ¶10, July 19, 2012).

Yip states that Nadel, in combination with Christopher Moody and Neil Moody, raised $327 million from investors in connection with more than 700 investor accounts between May 1999 and

---

[17]  Yip relied upon a memo/letter of Nadel's dated on or about February 5, 2009, that he provided false gains as early as 1998.  *See* Yip Decl n.2, March 23, 2012 (citing *U.S. v. Nadel*, U.S. District Court for the Southern District of New York, case no. 1:09-cr-00433-JGK (doc. 71-6)).

15

January 2009.  *See* Yip Decl. ¶¶ 47-48, March 23, 2012; Revisions to Yip Decl. ¶8, July 19, 2012.

Her report indicates that investors received monthly statements for each of their respective accounts

showing purported appreciation and increase in investor account balances that were in fact not true.

Yip Decl. ¶ 50, March 23, 2012.  Nadel controlled a number of bank, brokerage, and trading

accounts from July 1999 through January 2009, and he transferred money received from investors

among a number of those accounts.  Investor funds were directly deposited into bank accounts

maintained at SouthTrust (later acquired by Wachovia), Bank of America, and Northern Trust, and

funds from these bank accounts were transferred to brokerage accounts for the purpose of investing

the investors' funds.  Yip Decl. ¶¶ 51-53, March 23, 2012.  Funds from these brokerage accounts

were transferred back to the Hedge Funds' respective bank accounts to pay management fees based

on purported account balances, management fees based on purported profits, and redemptions to

investors.  Nadel also transferred funds from these brokerage accounts to other accounts he

controlled, including personal bank accounts at Wachovia Bank with names similar to Hedge Fund

accounts.  Yip Decl. ¶¶ 55-56, March 23, 2012.  According to Yip, "Nadel created these accounts

for two Hedge Funds on whose behalf he did not have authority to act ... [and he] had complete

access and control of the funds deposited into these accounts."  Yip Decl. ¶ 56, March 23, 2012.

Yip further declares that Nadel pooled funds received from investors and deposited into

accounts, commingled these funds with other investors' money, and transferred the money from

those accounts into other bank, brokerage, and trading accounts in which the money was further

pooled and commingled with other investors' money.  Yip opines that her review revealed that

"Nadel pooled and commingled investors' monies regardless of with which Hedge Fund the monies

had been invested; that Nadel not only commingled the monies in these accounts, he would also

16

transfer funds into the brokerage accounts as necessary in order to have sufficient funds from which to pay redemptions; and that these funds would be transferred from the Hedge Fund brokerage account to the Hedge Fund bank account from which the investor would receive his or her redemption." Yip Decl. ¶ 58, March 23, 2012.

According to Yip, the balances of the principal invested by investors, as reflected by the K-1s issued by the Hedge Funds during the years 1999 through 2002, clearly showed that Nadel significantly misrepresented the values in the investor accounts, which had only a fraction of the purported balances. Yip Decl. ¶ 59, March 23, 2012; Revisions to Yip Decl. ¶9, July 19, 2012. *See* Table comparing balance of principal invested compared to actual account balances; Yip Decl. Ex. 59, March 23, 2012, containing balances purportedly in the accounts for the investors at each quarter end during the period of January 2003-December 2008. For example, according to Advent's investor statements, at the end of the first quarter of 2003 investors had invested a total of $49,363,230 with Nadel and the hedge funds, when in actuality the total balances in the bank, brokerage and trading accounts were $19,987,238. And, at the end of the fourth quarter of 2008, investors had invested a total of $294,512,345 with Nadel and the hedge funds when in actuality the total balances in the bank, brokerage and trading accounts were $1,338,471. Yip Decl. ¶ 61, March 23, 2012.

Yip concludes that analysis showed that for each quarter between the first quarter of 2003 and the fourth quarter of 2008, the Hedge Funds always had significantly less money in the financial accounts than the amounts deposited by investors. Yip Decl. ¶ 64, March 23, 2012. Moreover, Nadel also controlled Traders Investment Club, another investment vehicle purportedly operated separately from the hedge funds. Yip opines that, similar to the hedge funds, Nadel represented to investors that he had achieved high rates of return in order to induce investors to invest. Yip Decl.

¶ 28, March 23, 2012.  Yip reviewed Traders' brokerage statements, Traders' bank statements, yearly federal income tax returns, Partners' Capital Balances statements from Advent and Individual Account Statements, and concluded that Nadel utilized investor principal to pay new investors, and in fact, used investor monies from the hedge funds to pay for Traders' investors' redemptions.  Yip Decl. ¶¶ 65-72, March 23, 2012.  As early as 2003, Traders did not have the assets necessary to pay the amounts represented as owed to investors, and investor distributions were paid with new investor funds, often from the Hedge Funds.  Yip Decl. ¶ 74, March 23, 2012.

Nadel's records, according to Yip, show that Nadel lost more than $23 million over the period of September 1999 through December 2008.  Specifically, Scoop Real Estate LP lost $6,637,880; Valhalla Investment Partners lost $3,114,011; Victory Fund Ltd. And Victory Funds IRA Fund lost $4,209,134; and Viking Fund LLC and Viking IRA Fund, LLC lost $9,116,715.  Yip Decl. ¶ 78, March 23, 2012.  Yip's review did not reveal any other sources of funding for Nadel's hedge funds or fund managers other than a negligible amount from Scoop Real Estate representing less than 1% of the funds.  Yip Decl. ¶ 79, March 23, 2012.  After a comprehensive review of the books and records of the hedge funds that the funds were insolvent as early as 2000 and through and including January 2009.[18]  Revisions to Yip Decl. ¶10 Table, July 19, 2012 (reflecting year end

---

[18]  Yip defined solvency as "an entity that has sufficient current assets to meet or exceed current liabilities."  She defined insolvency to the extent that "liabilities exceed the assets of the entity and its ability to meet these obligations."  The books and records reviewed included bank statements, check copies, cancelled checks, wire transfer documentation, deposit slip, deposit confirmations, tax returns filed by the Hedge Funds, QuickBooks records and information maintained on the Advent system.  Yip additionally reviewed correspondence in which Nadel admitted to:  using all of our liquid assets to cover redemptions and withdrawals, nothing is left." in a letter to his wife, Peg.  The assets were calculated based on detailed analysis of actual balances in each bank and brokerage accounts as well as other assets recorded by the Hedge Funds in its QuickBooks records.  The liabilities were calculated as the obligations to the investors for the principal they had invested and liabilities recorded by the Hedge Funds in its

insolvency for years 2000-2002).  *See also* Revisions to Yip Decl. Ex. 61 (Revised), July 19, 2012

(providing quarterly information reflecting insolvency during period of 2003-2008).

Meeker is one of the investors who experienced a net gain or "false profits."  According to

Yip, Meeker deposited a total of $1,250,000 in Nadel's scheme.  More particularly, Meeker invested

$1,000,000 in December 2003 and $250,000 in December 2004, all in Viking Fund, LLC ("Viking").

And, according to the Receiver, Meeker received distributions totaling $1,895,641.67: $700,000 in

January 2006, $500,00 in March 2006, $200,000 in January 2007, $200,000 in April 2007, $290,000

in September 2007, and $5,641.67 in September 2007.  Hence, these "false profits" amount to

$645,641.67 (the amount received from the scheme in excess of the amounts invested).  *See* Yip

Decl.¶ 3, Sept. 27, 2012.  There is no dispute as to whether Meeker received these distributions.  *See*

Morello Decl., ¶5, Meeker's responses to Receiver's First Set of Requests for Admissions, Ex. D

and E to Morello Decl.

Yip's concluding opinions are:

> 1.  In order for Nadel to sustain his investment operations, he required a
> continuous infusion of contributions from his investors.  The infusion of new funds
> into his operation from new and existing investors allowed Nadel to meet the initial
> investors' request for redemptions.  With the exception of the *de minimus* rental
> income that was generated, there is no indication of any other sources of income that
> Nadel could have used to pay the existing investors.

> 2.  Nadel created the classic Ponzi scheme by paying existing investors with
> deposits from new and existing investors.  In my opinion, based on the extensive
> information that I have reviewed, it is evident that the combination of the actual
> losses coupled with the ever growing management fees (based on inflated balances
> from purported gains) caused the ultimate collapse of this Ponzi scheme because
> there was no way for Nadel to meet the investors' redemption requests without the
> use of new funds from existing investors and funds from new investors.

---

QuickBooks records.  Yip Decl. ¶¶ 80-81, 83-86, March 23, 2012.

3.  Based on my analysis of the information that we reviewed, it is clear that Nadel operated a Ponzi scheme through Hedge Funds and Fund Managers from at least May 1999 through January 2009, when the funds collapsed.

4.  The Hedge Funds were insolvent as early as 2000 through and including January 2009, when the funds collapsed.

5.  Traders' raised funds from investors beginning as early as May 1999, paid out Management Fees on purported profits yet did not have trading activity until July 2003.

6.  Similar to the Hedge Funds, Traders also operated as a Ponzi scheme misrepresenting purported profits to investors and using the monies of new investments from existing investors or monies from new investors to meet the redemption of existing investors, in furtherance of Nadel's Ponzi scheme.

Yip Decl. ¶¶87-92, March 23, 2012.   In her revisions to her declaration, Yip further stated that:

Pursuant to a review of bank statements, cancelled checks, wire information, deposit slips, copies of checks, QuickBooks files, federal tax returns, Advent software information, and investor files maintained by the Hedge Funds, the investors of the Hedge Funds and Traders incurred losses in excess of $168 million.

Revision to Yip Decl. ¶12, Ex. B (schedule of gains and losses for each investor account), July 19, 2012.

### 3.  *Nadel's criminal proceedings and admission*s

Nadel's admissions, his plea agreement, his testimony at his plea and sentencing hearings, and his criminal judgment are persuasive evidence supporting the Receiver's motion for partial summary judgment for the reasons I stated in my Order of February 3 and reiterated in Part B.1.b of this report.  Nadel's guilty plea is appropriate for summary judgment consideration either under Fed. R. Evid 807 or as a declaration or deposition for purposes of Rule 56(c) and carries a heightened standard of reliability and trustworthiness.  *See In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008) (applying Rule 807's residual hearsay exception due to proceeding's reliability); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (a defendant's admissions in a guilty plea proceeding and in a plea

agreement that is part of the guilty plea carry "veracity safeguards" exceeding a deposition).  *See generally In re Rothstein,* 2010 WL 5173796 (S.D. Fla. Dec. 14, 2010) ("[c]riminal plea agreements are admissible to establish the existence of a Ponzi scheme and a wrongdoer's fraudulent intent" and "criminal convictions based on operating a Ponzi scheme establish fraudulent intent for the purposes of the fraudulent transfer provisions");  *LaBella v. Bains,* 2012 WL 1976972 (S.D. Cal. May 31, 2012) (granting summary judgment for receiver against multiple defendants where court took judicial notice of ponzi schemer's guilty plea agreement and found that he operated a ponzi scheme with actual intent to defraud creditors under UFTA); *In re Madoff,* 445 B.R. 206 (S.D. N.Y 2011) quoting *In re Slatkin, supra,* 525 F3d at 814 ("A debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent ... as a matter of law");  *Armstrong v. Collins,* 2010 WL 1131158 (S.D. N.Y March 24, 2010 (finding schemer who defrauded investors ran a ponzi scheme and that the entities involved were never solvent based on schemer's testimony, his guilty plea and expert opinion).  *See also In re McCarn's Allstate Finance, Inc.,* 326 B.R. 843, 851 (M.D. Fla. 2005) ("Even if the information or indictment did not specifically label the fraud a 'Ponzi scheme,' if the allegations in the information establish that the debtor ran a scheme whereby the debtor intended to defraud the debtor's creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi scheme.").

When Nadel entered pleas of guilty to all the indictment's counts, he acknowledged, under oath, his understanding of the accusations and that a factual basis supported his pleas.  *See* doc. 60-15 at 10.  Likewise, in his plea agreement, Nadel acknowledged that he was pleading guilty because

he was in fact guilty (doc. 60-15).  As the Receiver points out, during Nadel's allocution, Nadel

explained:

> Beginning in about 2002 and continuing to January 2009, I engaged in knowingly and willfully fraudulent activity for the purpose of obtaining money from investors in the funds and converting the investors; money to my own use.  To do so, I fabricated inflated rates of return from my trading activities and fabricated the net asset value of each of the funds.  Using these fabricated numbers, I repeatedly communicated to investors and prospective investors that the funds had consistent and extremely positive performances and rates of return and that the net asset value of each of the funds was in the tens of millions of dollars. These communications were knowingly and willfully made false and made for the purpose of inducing investors to invest and keep their money in the funds.[19]

*See* Guilty Plea Transcript, doc. 60-15, at 30.  Nadel further stated that he directed his broker to make

certain wire transfers among accounts that he controlled "for the purpose of facilitating and

concealing the scheme to defraud . . . ."  *Id.* at 31.

At the sentencing hearing, Nadel spoke of his "victims" and clearly acknowledged his guilt:

> I have had almost two years to think about the victims in my case.  I have pictured myself in their position while visualizing the faces and hearing the voices of those I knew personally.  Recently I read their letters over and over again, until their anger and outrage became mine at myself.  I experienced a steep dissent into regret and remorse followed by sorrow and self-hatred, into a deep depression.  It took great effort to struggle out of it.

> I spend most of my time in examination of my life not to excuse but to try to understand my harmful past behavior.  I blame no one but myself for my acts and observe that I have been my own worst enemy.  In effect, I have thrown away everything I have lived for: Family, friends, social acceptance, and honor, a sense of self-worth and accomplishment, all my possessions and, finally, freedom itself.

---

[19] Although Nadel's sworn statements are obvious evidence that he operated the hedge funds as a ponzi scheme by the time of the applicable distributions here, Nadel's temporal recollection is self-serving and contradicted by the record in the criminal case.  For example, the sentencing-guideline loss calculation dated back to 1999, a fact that Nadel did not object to at his sentencing proceeding.  And at other times discussed *infra,* Nadel acknowledged he "doctor[ed]" continuing losses for more than 10 years and that the hedge fund losses could be calculated by going back to 1998.

*See* Sentencing Transcript, doc. 60-18, pp.15:23-16:12.   Nadel did not object to the restitution amount, nor did he object to those victims identified in his presentence report and included in his judgment.   Similarly, when the court advised Nadel of the forfeiture calculation, $162 million, his counsel represented that he had no objection.   *See* Preliminary Order of Forfeiture (doc. 60-19), and Sentencing Hearing Transcript (doc. 60-18).   The court sentenced Nadel to 168 months of imprisonment.   *See* Judgment, doc. 60-17.   Nadel's plea agreement, his sworn admissions, his guilty plea, his failure to object to the court's restitution and forfeiture calculations (both premised on his scheme spanning from 1999 to 2009), and court's judgment support Yip's findings.[20]

Nadel's own statements further support the Receiver's motion.   In a January 2009 letter found in a hedge fund office shredder by a Scoop Management employee ("Shredded Letter"), Nadel admitted that "[f]or more than ten [years], I have truly believed that [I could] trade my way out of this mess, and [only] in 2008 did it finally penetrate my addled [brain] that this is not to be.  I have managed to ruin hundreds of lives, and I deserve whatever [I] ultimately receive."   Nadel also sent a letter to his family after he disappeared in January 2009 admitting that he had been attempting to "'doctor' continuing losses for almost 10 years."   In the letter, Nadel suggested that the hedge funds losses could be calculated by "go[ing] back as far as possible, to 1998 if we can, to Spear, Leads & Kellogg from Goldman, Sachs, and determine the actual trading losses."   He stated that his "recollection of the more recent losses, say from 2001 on, is about an average of $20 million per year. ..."   Nadel wrote a confidential memo that provided a background of himself and the hedge

---

[20]   As I noted in my Order of February 3, Nadel's failure to object to probation officer's loss calculation in the presentence report admits its factual accuracy.  *See United States v. Wise,* 891 F.2d 970, 972 (11th Cir. 1989).   This restitution amount (almost $175 million) corresponded with losses to victims from 1999 to 2009.

funds, including the operation of the investment clubs before the formation of the hedge funds.  In

the confidential memo, Nadel wrote:

> All six [hedge funds] were traded together as a group usually ... [B]y 1999 the volatile tech bubble created losses.  When the bubble burst I began to "doctor" the trading results.  It started in a small way, but as the assets increased, it became more difficult to cover the losses, and then came 9/11/2001, followed by the recession of 2002.  All of this time, I believed that I could trade my way out of the discrepancies between the stated assets and the actual assets.

*See* doc. 28-3, 28-4, 28-5.[21]

### 4. Meeker's rebuttal

In response to this overwhelming evidence, Meeker offers little rebuttal evidence in

admissible form.  *See Celotex Corp.,* 477 U.S. at 324 (1986) (if the moving party makes the required

showing, the burden shifts to the non-moving party to rebut that showing by producing counter-

evidence in admissible form).  *See* doc. 89.  Initially, Meeker argues that the Receiver's motion for

partial summary judgment makes a sweeping conclusion that a ponzi scheme is established while

Nadel's plea and other statements actually disprove that he ran a ponzi scheme.  According to

Meeker, that Nadel's plea fails to articulate that he ran a ponzi scheme and that Nadel has not signed

an affidavit admitting to a ponzi scheme despite Nadel's cooperation with the Receiver and his

attorneys to assist in recovering funds from receivership investors, shows that the elements of a ponzi

scheme must be lacking. This argument is unpersuasive, however, and I have already addressed that

the evidentiary record supports a finding that Nadel ran the hedge funds and Traders as a ponzi

scheme.  *See §C. Discussion, supra; In re McCarn's, supra,* 326 B.R. at 851 ("Even if the

information or indictment did not specifically label the fraud a 'Ponzi scheme,' if the allegations in

---

[21] Given Nadel's recent death, all these statements are admissible per Fed.R.Evid. 804(b)(3)(A) or 807.

the information establish that the debtor ran a scheme whereby the debtor intended to defraud the debtor's creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi scheme."). Meeker points out that although the Receiver asserts that the ponzi scheme began in 1999, Nadel admitted to fraud beginning in 2002 during his plea and that Nadel conducted legitimate business operation in which substantial profits were made, disproving a ponzi scheme. Given that the relevant time frame in this case is January 2006 through September 2007, Meeker's argument is self-defeating.

Undoubtedly, Nadel did trade. He also commingled funds, purposely misrepresented his earnings and losses, and applied the influx of new investors' moneys to pay off old investors and further the scheme. The legitimacy of some trading activity does not wipe clean the overarching illegitimacy of the scheme. The only evidence before me shows that Nadel operated the hedge funds such that little or no legitimate business was conducted, the hedge funds produced little or no profits or earnings, and the transfers to investors was from cash infused by new investors, thus satisfying the elements needed to prove a ponzi scheme.

Meeker cites to Nadel's statements about his belief that he could "trade his way out" and that his fraud started in a small way with moderate profits made at first, attempting to show that at least in the earlier years Nadel conducted some legitimate business. However, such statements are inadmissible as they are not statements against interest and are not admissible under Fed.R.Evid. 804(b)(3). *Macuba v. Deboer,* 193 F.3d 1316, 1323 (11th Cir. 1999) (the general rule is that inadmissible evidence cannot be considered for summary judgment purposes). *See also Scholes,* 56 F.3d at 762 (ponzi schemer's backpedaling statements made in affidavit were appropriately rejected for summary purposes as schemer should not be able to retract admissions made in plea agreement

and guilty plea which bind a party and have greater veracity safeguards); *Ciccarelli v. Gichner Systems Group, Inc.,* 862 F.Supp. 1293 (M.D. Penn. 1994) citing *Williamson v. United States,* 512 U.S. 594 (1994) (for purposes of summary judgment motions, court would consider only those portions of now deceased affiant's statements that were against his interest and would not consider collateral portions as they lack "same indicia of reliability" as portions covered by Rule 804(b)(3)). More relevant are the sworn statements Nadel made in his criminal proceedings and his statements against interest, and Nadel's failure to object to the forfeiture and restitution calculations that were based upon losses from 1999 forward, all of which support the conclusion that by 2006 he was working a ponzi scheme.

Next Meeker contends Yip's declaration is unreliable as she has "no expertise" in relation to hedge funds, she fails to prove a ponzi scheme, and his expert (Harold McFarland) contradicts her opinions. As for Yip, Meeker levels a host of complaints: she does not know the difference between a legitimate operation of hedge funds versus a ponzi scheme operation; she improperly relied on unverified findings of the third party analyst the Receiver retained; she unjustifiably excluded pertinent evidence; and she incorrectly concluded that Nadel conducted "little or no legitimate business operations" and earned "little or no profits," although she acknowledged Nadel made trade profits from 2002 to 2005. But as Yip reports, trading profits alone are not sufficient evidence to reach a conclusion regarding whether or not the hedge funds operated as a ponzi scheme. Yip explains that "[a]lthough the Hedge Funds had net trading profits during 2002-2005, the same Hedge Funds paid out in excess of $36 million to its Fund Managers based on inflated trading profits and fictitious net asset values." *See* Yip Decl. ¶¶ 26-27, Oct. 11, 2012.

Meeker's expert, McFarland, who is a certified CPA, does not alter the quantum of proof the

Receiver puts forth (doc. 89-8).   Indeed, the bases of his opinions are suspect.[22]   For example, he admits that he conducted only a partial, incomplete analysis, had not reviewed certain relevant documents, and did not consider whether Nadel had made any misrepresentations to the hedge fund investors.   *See* McFarland Dep. 72:19-73:17, 127:24-128:6 (docs. 92-2 and 92-3) (McFarland testified that he "really had not done the analysis" to determine when he first saw traits of a ponzi scheme because he had only analyzed the first three years of Traders and had not examined "the other ones").   A number of clawback defendants have used McFarland, and his opinions have varied and are sometimes contradictory.  For instance, regarding Meeker, McFarland expresses "significant doubt as to whether these hedge funds were in fact a Ponzi-scheme from the beginning or simply a legitimate business enterprise that at some point became a Ponzi-scheme.   While the Commission found it to be a Ponzi-scheme from 2008, there is insufficient information to determine when exactly, or if, it became a Ponzi-scheme before that."   *See* McFarland Rpt. ¶ A(10).   This contrasts with his declaration in *Rowe* where he opines "there is sufficient evidence to determine that these entities compromised an elaborate Ponzi scheme some time during or after 2006 … [and] there are some artifacts of a Ponzi scheme as early as 2003."  *See* McFarland Decl. ¶¶ C(1-2) (*Wiand v. Rowe,* case no. 8:10-cv-245, doc. 70).  He goes on in *Rowe*: "At best, the only thing that can be said with complete confidence is that the evidence is conclusive that Nadel-Moody was insolvent and a Ponzi scheme from 2006 forward and inconclusive prior to 2005, further it is unlikely that Nadel-Moody was a Ponzi scheme prior to 2002."  McFarland Decl. ¶ C(4) (*Wiand v. Rowe*, case no. 8:10-cv-245, doc. 70.  But then he hedges: *see* McFarland Dep. 62:22-63:12 (*Wiand v. Rowe,* doc. 83-1) ("... the early years, '99 and 2000, 2001, were definitely not a Ponzi scheme.  So I don't know when it was.

---

[22]   The Receiver has moved to strike McFarland's opinions (doc. 99).

I believe it was from 2006 forward.  At this point it's my opinion that it was not in '99, 2000, 2001.

It was some time after that.  And the strongest evidence is pretty heavy at 2005, or so, it changed

[into a Ponzi scheme]. … By the end of 2006, I have no questions that it was a Ponzi scheme.").

Further, some of McFarland's criticism of certain aspects of Yip's report are mistaken.  For example,

he claimed that Yip incorrectly considered the period between 1999 through 2009 as one single unit.

But that premise is misplaced.  Yip performed a detailed quarterly analysis for each year from 1999

through 2008, and attached no fewer than 62 exhibits demonstrating her thorough analysis of

financial statements.  *See*  Yip Decl. ¶¶ 59-60, 82, Ex. 6-61, March 23, 2012; Yip Decl. ¶¶ 25-31,

Oct. 11, 2012.

That Meeker proffers McFarland's report does not mean summary judgment is automatically

inappropriate.  *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) quoting *Merit*

*Motors, Inc. v. Chrysler Corp.* 569 F.2d 666, 672-73 (D.C. Cir. 1977) ("Rule 703 was intended to

broaden the acceptable bases of expert opinion, but it was not intended, as appellants seem to argue,

to make summary judgment impossible whenever a party has produced an expert to support its

position."); *see also American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569 (11th Cir. 1985)

(finding trial court properly awarded summary judgment for defendant and did not err in assigning

"little weight" to plaintiff's expert's affidavits because the affidavits did not create a material issue

of disputed fact); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.

1999) (Expert opinions can defeat summary judgment only if they show "a process of reasoning

beginning from a firm foundation.").  In the end, the operative guides are Rule 56(a), (c), and (e),

and against these standards, the record overwhelming supports the Receiver's position that Nadel

operated the hedge funds as a ponzi scheme by 2006, when Meeker received his first distribution.[23]

Meeker raises other reasons against summary judgment.  He claims, for instance, that the Receiver has failed to prove that the transfers were Nadel's property, a requisite element of FUFTA. According to Meeker, the  Receiver has failed to prove that Nadel and the receivership entities are alter egos, or that Nadel exclusively created, managed and controlled the receivership entities.  The Eleventh Circuit has indicated a willingness to allow a receiver to pursue FUFTA claims under substantially similar facts and at least implicitly recognized that "in a receivership proceeding, there need not be an artificial distinction between the property of a Ponzi scheme perpetrator and the property of his alter ego corporations used to perpetrate the scheme." *In re Burton Wiand Receivership Cases Pending in the Middle Dist. of Fla.,* case no. 8:05-cv-1856-T-27MSS, 2008 WL 818504, *2 (M.D. Fla. Mach 26, 2008) citing *S.E.C. v. Elliott,* 953 F.2d 1560 (11th Cir. 1992).

Meeker next argues that there is a dispute of material fact as to whether the transfers were property of the debtor under FUFTA.  An "asset" is defined as "property of the debtor" Fla. Stat. § 726.102(2).  The evidence before me clearly demonstrates that the funds transferred to investors as part of Nadel's scheme, including those funds transferred to Meeker, constitute "property of" Nadel under FUFTA because they are available to pay the debt owed by Nadel to each of the hedge funds arising from Nadel's operation of a ponzi scheme.  Meeker relies on a note purportedly written by Nadel to Colleen Cassidy (doc. 121-1), but the statements Meeker seeks to introduce in the Cassidy note are not statements against interest and are not admissible under Fed.R.Evid. 804(b)(3). *Macuba, supra* 193 F.3d at 1323 (the general rule is that inadmissible evidence cannot be considered

---

[23]  Because I find that Nadel, through the hedge funds, operated a ponzi scheme, it is unnecessary to address Meeker's assertion that Nadel's statements do not prove a blanket FUFTA violation.

for summary judgment purposes).

And, Meeker asserts that the Receiver has failed to introduce evidence concerning the illegitimate purpose for forming the receivership entities.  However, consistent with FUFTA, the Receiver sues on behalf of each of the hedge funds, including Viking, under the premise that Viking and the rest of the hedge funds have claims against Nadel because he operated them as a fraudulent scheme.  Hence, each of the hedge funds has claims against and is thus a creditor of Nadel, and the Receiver explicitly identified the receivership entities as creditors, the wrongdoer, Nadel, as the debtor, and the creditor's claims against the debtor arising from the ponzi scheme perpetrated by Nadel, through the receivership entities.  Courts have consistently recognized that when a ponzi scheme's perpetrator diverts money that investors intended to invest with a receivership entity, the entity is harmed, even if the entity is controlled by the scheme's perpetrator and used exclusively to perpetrate the scheme.[24]  For example, in *Scholes, supra,* 56 F.3d at 754, the court noted that "the appointment of the receiver removed the wrongdoer from the scene" such that the receivership

_____

[24] *See generally Knauer v. Jonathon Robert Fin. Group,* 348 F.3d 230, 235 (7th Cir. 2003) ("As long as an entity is legally distinct from the person who diverted funds from the entity, a receiver for the entity has standing to recover the removed funds."); *Goldberg v. Chong*, 2007 WL 2028792, *4 (S.D. Fla. July 11, 2007) ("TEGFI [a receivership entity], as a creditor alleging a claim against a debtor, has standing to bring a FUFTA claim against Defendants [recipients of receivership entity money or proceeds]. The Receiver, having been so authorized by the Court, has standing to assert claims on TEGFI's behalf"); *Quilling v. Grand St. Trust,* 2005 WL 1983879, *5 (W.D.N.C. Aug. 12, 2005) (finding receiver had standing to assert fraudulent transfer claims on behalf of corporate entities owned or controlled by ponzi scheme operator from whom assets were fraudulently transferred); *Marwil v. Farah,* 2003 WL 23095657, *7 (S.D. Ind. Dec. 11, 2003) (quoting *Scholes* and finding receiver, as representative of receivership entity, had standing to bring equitable disgorgement claim arising from fraud on receivership entity that Church operated to receivership entity's damage);  *Obermaier v. Arnett*, 2002 WL 31654535, *3 (M.D. Fla. Nov. 20, 2002) (holding receiver could assert fraudulent transfer and unjust enrichment claims against beneficiaries of alleged ponzi scheme to redress injuries to receivership entities).

entities were no longer the ponzi scheme principal's "evil zombies."  Freed from the principal's

"spell" the entities "became entitled to the return of the moneys–  for the benefit not of [the

principal] but of innocent investors – that [the principal] had made the [entities] divert to

unauthorized purposes."  In finding that the receiver had standing to bring fraudulent transfer claims,

the *Scholes* court stated:

> Now that the corporations created and initially controlled by [the Ponzi scheme
> principal] are controlled by a receiver whose only object is to maximize the value of
> the corporations for the benefit of their investors and any creditors, we cannot see an
> objection to the receiver's bringing suit to recover corporate assets unlawfully
> dissipated by [the principal].

*Scholes*, at 755 (finding receiver Scholes had standing to bring fraudulent conveyance action against

investors).  And, courts have consistently allowed receivers to file similar FUFTA "clawback" causes

of action. *See generally Dillon v. Axxsys, Int'l, Inc.,* 185 Fed. Appx. 823, 830 (11th Cir. 2006)

(finding that once the principals decided to use the plaintiffs' money for non-business purposes, i.e.

transferring assets to their own account, the plaintiffs became creditors and possessed a viable claim

according to FUFTA.); *Warfield v. Byron,* 436 F.3d 551, 554-55 (5th Cir. 2006) (allowing receiver

to bring UFTA claims against individuals and entities to recover receivership assets where ponzi

scheme operator caused receivership entities to effect transfers); *Troelstrup v. Index Futures Group,*

*Inc.*, 130 F.3d 1274, 1277 (7th Cir. 1997) citing *Scholes, supra,* 56 F.3d at 753-54 (recognizing that

"receiver, who had also been appointed the corporations' receiver, had standing to sue on behalf of

the corporations, because they were entitled to the return of the money that the defrauder had

improperly diverted from them"); *In re Burton Wiand Receivership Cases Pending in the Tampa*

*Div. of the Middle Dist. of Fla.,* 2008 WL 818504, *4 (M.D. Fla. March 26, 2008) ("*Waxenberg II*")

(denying motion to dismiss receiver's amended FUFTA claims against debtors because debtor's

transfer of receivership entities' assets constituted transfer of "property of the debtor"); *Warfield v. Carnie*, 2007 WL 1112591, *9 (N.D. Tex. 2007) ("A receiver of an alleged Ponzi scheme may sue under the UFTA to recover funds paid from the entity in a receivership"); *Quilling v. Cristell*, 2006 WL 316981, *6 (W.D. N.C. 2006) (finding "once Receiver was appointed, the [ponzi scheme entities] were freed from control of [the ponzi scheme operator] and the [entities] became entitled to the return of the funds that were wrongfully diverted to the Defendants ... "Receiver, as receiver for all entities owned or controlled by [ponzi scheme operator] including the [ponzi scheme entities] properly has standing to bring fraudulent transfer claims that he is asserting against Defendants.").

Here, the Receiver has submitted evidentiary proof, discussed *supra*, that Nadel operated a fraudulent scheme by the time Meeker received his first distribution in 2006. The summary judgment record shows: (1) Nadel controlled each of the hedge funds; (2) that Nadel used that control to commingle invested money, misrepresent hedge fund performance, and inflate hedge fund asset values; (3) Nadel caused the hedge funds to transfer investors' commingled principle investment money to satisfy "distributions" based on the hedge funds' fabricated performance data and asset values; and (4) that as a result of this conduct, Nadel was indicted and pleaded guilty to all charges in the indictment, discussed *supra,* failed to object to the government's restitution and forfeiture calculations which were based upon his scheme spanning from 1999 through 2009, and made statements, discussed *supra,* admitting his criminal activity.[25]  Meeker fails to alter the

---

[25]  *See* Wiand Decl. (doc. 60) setting forth evidence that Nadel controlled Viking Fund, LLC and the other hedge funds.  In pertinent part, the declaration and the attached evidentiary documents show that Nadel incorporated Scoop Management in 2001 and served as its registered agent and sole officer and director (¶11, Ex.C); that Viking was formed in 2001, purportedly to invest in and/or trade securities including exchange traded funds (ETFs), that the managing member of Viking was Viking Management, that Viking Fund and Viking Management retained retained Nadel and his entity, Scoop Management, as their "Investment Consultant," and that

overwhelming quantum of evidence the Receiver presents.

### 5. affirmative defense

Fla. Stat. §726.109(1) provides a "good faith" defense for transfers made with actual fraud under Fla. Stat. §726.105(1)(a): "A transfer or obligation is not voidable under s. 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."  In its answer, Meeker raised this defense.  Specifically, affirmative defense two asserts Meeker was a good faith transferee without knowledge of any indicia of fraud who provided reasonably equivalent value for any amounts received.  *See* doc. 21, second affirmative defense.  However, as the Receiver indicates, it is well-settled that a receiver is entitled to recover from winning investors profits above the initial outlay, also known as "false profits," and an investor in a scheme does not provide reasonably equivalent value for any amounts received from scheme that exceed the investor's principal investment. *See Perkins v. Haines,* 661 F.3d 623, 627 (11th Cir. 2011) ("Any transfers over and above the amount of principal– i.e. for fictitious profits – are not made for 'value' because they exceed the scope of the investor's fraud claim and may be subject to recovery."); *Donell, supra,* 533 F.3d at 772 (amounts transferred by the ponzi scheme perpetrator to the investor in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity); *Scholes,* 56 F.3d at 757.

### 6. false profits/ set-off

Meeker does not dispute he invested in the hedge funds and received transfers from the hedge funds in connection with his investments. *See* Morello Decl., ¶5; Meeker's responses to Receiver's

Scoop Management provided "office management and technical services" to Viking Management (¶13, Ex.E); that even thought Nadel did not own Viking Fund, he was allowed to "fully control" its activities as its "investment advisor" (¶¶19-20, Ex. B-I).

First Set of Requests for Admissions, docs. 92-4, 92-5.  Evaluating these transfers, the Receiver

seeks $645,641.67 in false profits plus prejudgment interest, an amount that corresponds to the

Receiver's accounting in Exhibit A attached to the complaint.

Although Meeker admits the Receiver's accounting, he contends, citing to the Receiver's

Plan in the enforcement action, this amount should be set-off by the losses he and his wife, Barbara

Meeker, suffered in their other hedge fund accounts, namely his IRA and her account.  According

to the Plan, Meeker says all three Meeker accounts, the one at issue in this action, his IRA account,

and his wife's account (together the "Meeker accounts"), should be considered together.  *See* case

no. 8:09-cv-87-T-26TBM (docs. 675 (Receiver's Plan); 776 (Order granting Plan)).  Indeed, the

Receiver's Plan provides that "where Claimants have multiple Investor Accounts and one or more

of those accounts received False Profits, the accounts are considered on a consolidated basis."  *Id.*

Meeker complains that the Receiver has failed to abide by the plan requirements as his gains are set-

off by his losses in accounts held by his wife and his IRA.  Specifically, he asserts

> The Receiver inexplicably excepts Mr. and Mrs. Meeker (the "Meekers") from his
> own court-approved method of setting-off an investor's gains from one account with
> losses in another account, thereby double-victimizing the Meekers in seeking over
> half-a-million dollars from the Meekers when they have already suffered net losses
> far exceeding those alleged false profits.

doc. 120, p.9.  Meeker explains that the Meeker account upon which this case is based allegedly

made a net gain of $645,641.67 that should be set-off by the $736,875.23 in losses suffered  by the

Meeker IRA account (loss of $561,875.23) and Mrs. Meeker account (loss of $175,000).   Per

Meeker, the account summaries for the IRA and Mrs. Meeker accounts show that he had authority

to request distributions from the accounts.  *See* doc. 120, Ex. D-1 through D-7, Ex. E.   Moreover,

Meeker asserts that the Meeker IRA and Mrs. Meeker's accounts should be consolidated because

under Florida law they are shared collectively as "marital assets and liabilities." *See* Fla. Stat. §61.075(6)(a)1.a (defining marital property as "[a]ssets acquired and liabilities incurred during the marriage, individually by either or jointly by them").

Set-off is an equitable concept, *see Durham Tropical Land Corp. v. Sun Garden Sales Co.*, 151 So. 327, 328 (Fla. 1932). Florida recognizes that to avail oneself of set-off in equity, the defendant must show an existing debt or demand against the complainant in favor of the defendant, and that the debt arose and existed under circumstances where disallowing it would be inequitable. *Id.* "The very essence and basis for set-off is mutuality of claims; that is to say claims existing between the same parties and in the same right." *Everglade Cypress Co. v. Tunnicliffe*, 148 So. 192, 193 (Fla. 1933).

I find Meeker's set-off argument has merit. Meeker's accounting regarding the losses he and his wife suffered does not seem in dispute. But given that Meeker raised this issue in his response (doc. 120), and that it is almost akin to a summary judgment motion, the Receiver should be allowed to submit a reply and show cause why a set-off is inappropriate given the Plan's directives.[26]

### 7.  prejudgment interest

This Court exercises supplemental jurisdiction over the Receiver's FUFTA claims (doc. 1, ¶8). *See* 28 U.S.C. § 1367. As such, state law applies to any issue not governed by the Constitution or treaties of the United States or Acts of Congress. 28 U.S.C. § 1652; *Erie R. v. Tompkins*, 304 U.S.

---

[26] Local Rule 3.01(c) prohibited the Receiver from issuing a reply without first obtaining leave of court. And even if Meeker's response were not tantamount to a summary judgment motion, the Court could not grant summary judgment *sua sponte* without first giving notice to the parties that the Court intended to address the matter. *Moton v. Cowart*, 631 F.3d 1337, 1343 (11th Cir. 2011).

64, 78 (1938); *Flava Works, Inc. v. City of Miami, FL*, 609 F.3d 1233, 1237 (11th Cir. 2010); *see also* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4520.   Florida courts have long held the view that prejudgment interest is simply another element of pecuniary damages for making the plaintiff whole from the date of the wrongful loss.   *Bosem v. Musa Holdings, Inc.*, 46 So.2d 42, 45 (Fla. 2010) (reaffirming Florida's position since the turn of the last century).   An award, however, is grounded in equity and is not absolute.   *Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d 1286, 1297-98 (11th Cir. 2002) (applying Florida law).   Florida courts consider various factors when evaluating the equities.   These include the extent the plaintiff's conduct contributed to the delay between the injury and judgment, and whether the prevailing party failed to mitigate damages; in matters involving public bodies, and in choosing between innocent victims, it is inequitable to put the burden of paying interest on the public.   *Id.*   The list is obviously illustrative as each case is different.   But the driving focus demands balancing the equities at hand. As the Florida supreme court has said: "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness.   It is denied when its exaction would be inequitable."   *Flack v. Graham*, 461 So.2d 82, 84 (Fla. 1984) quoting *Board of Commissioners of Jackson County v. United States,* 308 U.S. 343, 352 (1939).

In view of these principles, I conclude that to exact prejudgment interest from Meeker would be inequitable.   Despite its position as a  "net winner," compared to the greater number of "net losers" Nadel swindled, Meeker is certainly not a winning investor in the normal sense.   Like the net losers, Meeker invested in the hedge funds assuming their legitimacy.   That he received a return in excess of his investments was likely serendipitous.   With the avoidance of those positive transfers (the amounts above principal invested), requiring Meeker to pay more out of his pocket in the form

36

of prejudgment interest would not satisfy the goals for making the award.  It would not make the hedge funds any more whole, as Meeker presumably could stand in line with the other net losers seeking compensation from the Receiver.  Simply put, Meeker has suffered enough.

### 8. *Meeker's partial summary judgment motion*

Meeker filed a motion for partial summary judgment seeking entry of an order finding certain of the Receiver's constructive fraud FUFTA claims barred by the statute of limitations (doc. 93). In light of my finding here that the transfers to Meeker are avoidable under the actual fraud cause of action spelled out in Fla. Stat. §726.105(1)(a), I need not determine whether any of the transfer were constructively fraudulent.   And, I need not determine whether any of the Receiver's constructive fraud claims are barred by the statute of limitations.  Meeker concedes that the second set of claims the motion (filed in this and several related clawback actions) seeks to bar by application of the statute of limitation, transfers from Traders Investment Club, are not at issue in this particular case.  *See* doc. 93, n.3.  For these reasons, I find the motion should be denied as moot.

### D.  Conclusion

As one court recently noted:

> Ponzi schemes leave no true winners once the scheme collapses.  In recognition of that unpleasant reality, courts adhere to the 'principle that equality is equity' in dealing with the aftermath of an imploded Ponzi scheme.

*Janvey v. Democratic Senatorial Campaign Comm., Inc. et al.,* 793 F.Supp. 2d 825, 858 (N.D. Texas 2011) citing *Donell, supra,* 533 F.3d at 779.  Upon consideration of the evidence before me, I find that Nadel operated the hedge funds as a ponzi scheme at the time of the transfers to Meeker, and that the transfers to Meeker were made with the actual intent to hinder, delay, or defraud as required by Fla. Stat. § 726.105(1)(a).  For the reasons given, it is hereby

RECOMMENDED:

1. That the Receiver's motion for summary judgment (doc. 90) be GRANTED to the extent that Nadel operated the hedge funds as a ponzi scheme at the time of the transfers to Meeker, and that the transfers to Meeker were made with the actual intent to hinder, delay, or defraud as required by Fla. Stat. § 726.105(1)(a).  Though I find the transfers to Meeker avoidable under FUFTA, and that there are $645,641.67 in false profits, the Receiver should be given 14 days to show cause why that amount should not be offset by the $736,875.23 in losses Meeker and his wife suffered in their other hedge fund accounts.

2.  That the Receiver's renewed motion for partial summary judgment (doc. 59) be found moot.

3.  That the Receiver's motion to strike report of Defendants' designated expert, Harold McFarland, and to Preclude His Testimony at Trial (doc. 99) be DENIED.

4.  That Meeker's motion for summary judgment relating to statute of limitations (doc. 93) be DENIED.

IT IS SO REPORTED at Tampa, Florida on December 13, 2012.

_Mark A. Pizzo_
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).

cc:    Hon. Elizabeth A. Kovachevich
          Counsel of Record